Meredith L. Thielbahr, ISB No. 9733
David W. Lloyd, ISB No. 5501
GORDON REES SCULLY MANSUKHANI, LLP
999 W. Main Street, #100
Boise, ID 83702
Telephone: (208) 489-9095
mthielbahr@grsm.com
dlloyd@grsm.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JTH TAX LLC d/b/a LIBERTY TAX SERVICE f/k/a JTH TAX, INC., <br><br>       Plaintiff, <br><br> v. <br><br> T2L, LLC; AND TERESA WAYNETSKA, <br><br>       Defendants. | CIVIL ACTION NO. 1:22-cv-151 <br><br> **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## I.  INTRODUCTION

JTH Tax LLC d/b/a Liberty Tax Service f/k/a JTH Tax, Inc. ("Liberty"), by and through

its undersigned counsel, and pursuant to Fed. R. Civ. P. 65, hereby moves for entry of a preliminary

injunction against Defendants T2L, LLC ("T2L") and Teresa Waynetska ("Waynetska") (together,

"Defendants"). In support thereof, Liberty submits the following Memorandum of Law.

## II.  PRELIMINARY STATEMENT

Defendants are former Liberty franchisees who have repeatedly and continuously breached

the Franchise Agreement and the Mutual Termination Agreement they entered into with Liberty.

To avoid paying royalties to Liberty, and without informing Liberty and without Liberty's

knowledge, Defendants have operated, and continue to operate, a competing tax preparation

business just four miles from their Liberty Tax franchise location following the termination of the

Franchise Agreement. The operation of the competing tax preparation business violates the post-

termination non-competition and non-solicitation covenants in the Franchise Agreement and

Mutual Termination Agreement. Until recently, Liberty was not aware that Defendants have operated, and continue to operate, their competing tax preparation business in violation of the Franchise Agreement and Mutual Termination Agreement.

Additionally, to support their competing tax preparation business, in violation of the Franchise Agreement and Mutual Termination Agreement, Defendants have unlawfully used, and continue to unlawfully use, Liberty's confidential information and trade secrets, including Operations Manuals, customer lists and customer records.

Liberty now seeks a preliminary injunction requiring Defendants to comply with the post-termination obligations under the Franchise Agreement and Mutual Termination Agreement, including enjoining Defendants from operating a competing tax preparation business for a period of two years from the entry of the preliminary injunction, and ordering Defendants to return (and enjoining Defendants from using) Liberty's confidential information and trade secrets, as required by the Franchise Agreement and the Mutual Termination Agreement.

## III.   STATEMENT OF FACTS

### A.   Liberty's Franchise System.

Liberty is the franchisor of Liberty Tax Service® income tax preparation service centers located throughout the United States, including the State of Idaho. *See* Verified Complaint ("VC"), ¶ 13; Declaration of Geoff Knapp ("Decl."), ¶ 4. Liberty has spent substantial time and money advertising and promoting the distinctive and well-known Liberty Tax Service® tax preparation system, which sells income tax preparation and filing services and products to the public under Liberty's various trademarks. VC, ¶ 14; Decl., ¶ 5. Liberty is one of the largest and most recognized tax preparation franchises in the United States. VC, ¶ 17; Decl., ¶ 8. Pursuant to the terms of the franchise agreements, Liberty discloses to franchisees certain confidential information ("Confidential Information") and trade secrets, including Liberty's confidential Operations

Manual, methods of operation of franchise, customer information and records, and marketing information. VC, ¶ 15; Decl., ¶ 6. Liberty maintains all such materials confidentially, and only discloses them to parties bound by confidentiality. VC, ¶ 16; Decl., ¶ 7. In return, Liberty requires that its franchisees agree that, upon expiration, termination, or nonrenewal of a franchise agreement, they will never use, disclose, or permit the use or disclosure of its Confidential Information. VC, ¶ 16; Decl., ¶ 7. Additionally, franchisees agree that upon termination, expiration, or nonrenewal of a franchise agreement, they will stop using all literature and forms received, return all Confidential Information and trade secrets to Liberty. VC, ¶ 16; Decl., ¶ 7.

### B.    The Franchise Agreement.

On or about June 24, 2013, T2L entered into a franchise agreement (the "Franchise Agreement") with Liberty for the Territory known as ID024, located in and around Payette, Idaho (the "Territory"). VC, ¶ 20; Decl., ¶ 11. Waynetska is a managing member of T2L. VC, ¶ 21; Decl., ¶ 12. In her capacity as managing member of T2L, Waynetska operated T2L, had complete access to Liberty's Confidential Information, and obtained the advantage of Liberty's nationally-recognized franchise system and goodwill. VC, ¶ 21; Decl., ¶ 12.

On or about December 4, 2018, Defendants entered into a mutual termination agreement with Liberty (the "Mutual Termination Agreement"). VC, ¶ 22; Decl., ¶ 13. As discussed in more detail in Section III.C, pursuant to the Mutual Termination Agreement, Defendants agreed to adhere to all post-termination covenants and obligations in the Franchise Agreement. VC, ¶ 22; Decl., ¶ 13.

During the period between the execution of the Franchise Agreement and the execution of the Mutual Termination Agreement, Defendants operated a Liberty tax preparation business (the "Franchised Business") from 1320 N. Whitely Drive, Fruitland, Idaho (the "Franchise Location").

3

VC, ¶ 23; Decl., ¶ 14. In exchange for Liberty's grant of a franchise allowing Defendants to "operate a tax return preparation business using Liberty's system and Liberty's Marks within the Territory," and specifically at the Franchised Location, Defendants contractually agreed to certain post-termination obligations. VC, ¶ 24; Decl., ¶ 15. Pursuant to the Franchise Agreement, Liberty provided Defendants with training in franchise operation, marketing, advertising, sales, and business systems. VC, ¶ 25; Decl., ¶ 16. Defendants also received a copy of Liberty's confidential operating, marketing, and advertising materials, which are not available to the public or to anyone who is not part of Liberty's business system. VC, ¶ 25; Decl., ¶ 16. Pursuant to the Franchise Agreement and the Mutual Termination Agreement, Defendants agreed to keep these materials confidential in perpetuity following the termination. VC, ¶ 25; Decl., ¶ 16.

Pursuant to Section 10(b) of the Franchise Agreement (and the Mutual Termination Agreement), Defendants agreed to a post-termination covenant not to compete within the Territory or within twenty-five miles of the Territory for two years following termination. VC, ¶ 30; Decl., ¶ 21. Pursuant to Section 10(d) of the Franchise Agreement (and the Mutual Termination Agreement), Defendants agreed to a covenant not to solicit customers served by the Franchised Business in the last twelve months they were a Liberty franchisee, within the Territory or within twenty-five miles of the Territory for two years after termination. VC, ¶ 31; Decl., ¶ 22.

Pursuant to Section 9 of the Franchise Agreement (and the Mutual Termination Agreement), Defendants agreed to certain post-termination obligations, including, among others, to immediately return to Liberty all copies of Liberty's confidential Operations Manual, customer lists, and customer files and records. VC, ¶ 28; Decl., ¶ 19. Pursuant to Section 12 of the Franchise Agreement, Defendants agreed not to use Liberty's Confidential Information for any purpose other

than the operation of the Franchised Business, and for any purpose whatsoever upon termination of the Franchise Agreement. VC, ¶ 36; Decl., ¶ 27.

Defendants further agreed: (a) that the non-competition and non-solicitation covenants in the Franchise Agreement (and the Mutual Termination Agreement) are reasonable, valid and not contrary to the public interest; (b) to waive all defenses to the strict enforcement of the non-competition and non-solicitation covenants; (c) that Liberty is entitled to a temporary restraining order, preliminary and/or permanent injunction for any breach of duties under any of the non-monetary post-termination obligations; and (d) that the non-competition and non-solicitation covenants survive any termination of the Franchise Agreement. VC, ¶¶ 34-35; Decl., ¶¶ 25-26.

### C.     Mutual Termination of the Franchise Agreement.

On or about December 4, 2018, T2L and Waynetska entered into the Mutual Termination Agreement. VC, ¶ 39; Decl., ¶ 30. Waynetska, as Managing Member of T2L, signed on behalf of T2L. VC, ¶ 39; Decl., ¶ 30. Pursuant to the Mutual Termination Agreement, T2L and Waynetska (collectively defined in the Mutual Termination Agreement as "Franchisee") each agreed to adhere to all post-termination covenants in the Franchise Agreement. VC, ¶ 40, Ex. E ¶ 5[1]; Decl., ¶ 31. Pursuant to the Mutual Termination Agreement, Defendants also agreed to immediately comply with all post-termination obligations contained in the Franchise Agreement, including, but not limited to: (1) abiding by the covenants not to compete and not to solicit in the Franchise Agreement; (2) delivering to Liberty all copies, including electronic copies, of lists and other sources of information containing the names of customers who patronized the Franchised Business; (3) delivering to Liberty all customer tax returns, files, records and all copies thereof;

---

[1] Paragraph 5 of the Mutual Termination Agreement states: "Franchisee acknowledges that all post-term covenants of the Franchise Agreement will be adhered to upon execution of this Agreement and thereafter.  Nothing contained in this Agreement shall be construed as limiting the continuing effectiveness of the post-term covenants of the Franchise Agreement."  Ex. E.

(4) delivering to Liberty all copies of the Liberty Operations Manual; and (5) stopping use of Liberty's Confidential Information. VC, ¶ 41, Ex. E ¶ 6[2]; Decl., ¶ 32.

### D.    Defendants' Breach of the Franchise Agreement and Mutual Termination Agreement, Trade Secret Misappropriation, and Unfair Competition.

An Electronic Filing Identification Number ("EFIN") is required by the IRS to file tax returns electronically and to become an authorized IRS e-file provider, otherwise known as an Electronic Return Originator ("ERO"). VC, ¶ 42; Decl., ¶ 33. Each ERO has a unique EFIN. VC, ¶ 42; Decl., ¶ 33. The IRS periodically publishes all ERO filing data for a particular tax year ("IRS ERO Database"). VC, ¶ 43; Decl., ¶ 34. The IRS ERO Database includes, *inter alia*, the legal name, trade name, address, application submission date, EFIN and corresponding tax office return count for all active EROs. VC, ¶ 43; Decl., ¶ 34.

The IRS ERO Database shows that Waynetska is an ERO with a registered business address of 34 S. Main Street, Payette, Idaho 83661 (the "Competing Location"), which is approximately four miles from the Franchise Location (1320 N. Whitely Drive, Fruitland, Idaho). VC, ¶ 44; Decl., ¶ 35. The IRS ERO Database also shows that in 2019, 2020 and 2021 (following the termination of the Franchise Agreement and during the term of the post-termination non-competition covenant) Waynetska continued to file tax returns from the Competing Location in violation of the post-termination non-competition and non-solicitation covenants in the Franchise Agreement and the Mutual Termination Agreement. VC, ¶ 45; Decl., ¶ 36. Between 2019 and 2021, over 500 tax returns were filed from the Competing Location. VC, ¶ 46; Decl., ¶ 37.

---

[2] Paragraph 6 of the Mutual Termination Agreement states, in part: "Franchisee shall immediately comply with the Post Termination Obligations contained in the Franchise Agreement, including, but not limited to, the following: . . . Abide by the covenants not to compete and not to solicit as described in the Franchise Agreement . . . Deliver to Franchisor all copies, including electronic copies, of lists and other sources of information containing the names of customers who patronized the Franchised Business . . . Deliver to Franchisor all customer tax returns, files, records and all copies thereof . . . Deliver to Franchisor all customer tax returns, files, records and all copies there of . . ."

Upon information and belief, in violation of the Franchise Agreement and the Mutual Termination Agreement, Defendants used and otherwise misappropriated Liberty's Confidential Information and trade secrets to file these tax returns from the Competing Location, including, without limitation, Liberty's Operations Manual, customer lists and customer records. VC, ¶ 47; Decl., ¶ 38. Accordingly, upon information and belief, Defendants also failed to comply with their post-termination obligations to immediately return all copies of Liberty's Operations Manual, customer lists, and customer records, and to cease using Liberty's Confidential Information. VC, ¶ 48; Decl., ¶ 39.

Upon information and belief, Defendants are currently offering electronic filing of tax returns at the Competing Location (using Liberty's Confidential Information and trade secrets) in violation of the non-competition and non-solicitation covenants in the Franchise Agreement and the Mutual Termination Agreement. VC, ¶ 49; Decl., ¶ 40. Liberty did not become aware of any of Defendants' violations the Franchise Agreement and the Mutual Termination Agreement described above until a recent internal audit of the IRS ERO Database. VC, ¶ 50; Decl., ¶ 41. Absent an injunction, Defendants will continue to offer electronic filing of tax returns at the Competing Location, and use Liberty's Confidential Information and trade secrets, in violation of the non-competition and non-solicitation covenants in the Franchise Agreement and the Mutual Termination Agreement. VC, ¶ 51; Decl., ¶ 42.

## IV.   ARGUMENT

To obtain a preliminary injunction, the moving party must show: "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest." *Idaho v. Coeur d'Alene Tribe*, 49 F. Supp. 3d 751, 762 (D.

Idaho 2014), *aff'd*, 794 F.3d 1039 (9th Cir. 2015) (citing *Winter v. Natural Res. Def. Council Inc.*, 555 U.S. 7, 20 (2008)). "The court may apply a sliding scale test, under which 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" *Id.* (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.2011)). Liberty readily satisfies each element required to obtain a preliminary injunction.

### A.    Liberty is Likely to Succeed on the Merits of Its Claims.

1.    <u>Liberty is likely to succeed on its breach of contract claims.</u>

a.  *The Franchise Agreement and the Mutual Termination Agreement are enforceable contracts, which Defendants have breached.*

A breach of contract under Virginia law[3] requires: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of that obligation. *See Filak v. George*, 267 Va. 612, 619 (2004).[4] Liberty satisfies all three requirements.

First, the Franchise Agreement and the Mutual Termination Agreement are legally enforceable obligations, in which Defendants expressly agreed to certain post-termination non-competition and non-solicitation covenants. Courts throughout the country consistently enforce Liberty's non-competition and non-solicitation covenants as reasonable restraints of trade. *See, e.g., JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818 (E.D. Va. 2007); *JTH Tax, Inc. v. Donofrio*, 2006 WL 2796841 (E.D. Va. Sep. 26, 2006); *JTH Tax, Inc. v. Abikarram*, 2019 WL 2254816, at *2-5

---

[3] The Franchise Agreement and the Mutual Termination Agreement each contain a choice-of-law provision stating that Virginia law governs all claims that in any way relate to or arise out of the respective agreement. *See* VC, Ex. A, § 17(a), Ex. E, ¶ 13; *see also DBSI Signature Place, LLC v. BL Greensboro, L.P.*, 2006 WL 1275394, at *6 (D. Idaho May 9, 2006) ("Idaho recognizes choice of law clauses.").

[4] Similarly, Idaho law requires a plaintiff to show: "(a) the existence of the contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages." *Hydroblend, Inc. v. Nothum Mfg. Co.*, 2014 WL 6850771, at *2 (D. Idaho Dec. 3, 2014).

(S.D. Fla. Mar. 22, 2019); *JTH Tax LLC v. Da Silva*, 2020 WL 3266568, at *2 (M.D. Fla. Mar. 11, 2020); *JTH Tax LLC v. McHugh*, 2020 WL 1689731, at *4 (W.D. Wash. Apr. 7, 2020); *JTH Tax, Inc. v. Magnotte*, 2020 WL 4284056 (E.D. Mich. July 27, 2020); *JTH Tax LLC v. Kelly*, 2020 WL 6504979, at *1-2 (W.D. Wash. Aug. 19, 2020).

Second, based on IRS ERO Database information, as further detailed in the Verified Complaint, Defendants have breached the post-termination non-competition and non-solicitation covenants in the Franchise Agreement (and further agreed to in the Mutual Termination Agreement) by filing tax returns at the Competing Location from 2019 through 2021. *See* VC, ¶¶ 42-52; Decl., ¶¶ 33-43. Defendants have also breached their other post-termination obligations in the Franchise Agreement (and further agreed to in the Mutual Termination Agreement) by failing to immediately return all copies of Liberty's confidential Operations Manual, customer lists, and customer files and records upon termination. *See* VC, ¶¶ 42-52; Decl., ¶¶ 33-43. Defendants have utilized the information they wrongfully possesses, including Liberty's Confidential Information, to compete with Liberty in violation of the Franchise Agreement and the Mutual Termination Agreement. *See* VC, ¶¶ 42-52; Decl., ¶¶ 33-43.

Third, Defendants' breaches of the Franchise Agreement and the Mutual Termination Agreement have damaged Liberty. Defendants have diverted tax preparation fees or royalties that Defendants should have paid to Liberty or that another franchisee would pay to Liberty. *See JTH Tax, Inc. v. Boone*, 2009 WL 10689518, at *2 (E.D. Va. May 7, 2009) ("Violating the non-compete and non-solicitation covenants results in the revenue from the franchise royalties to Liberty to be cut off as well as the loss of repeat and referral customers"). Moreover, as detailed in Section IV.B, Defendants' efforts to compete using Liberty's Confidential Information in violation of their post-termination obligations will irreparably harm Liberty, its franchise system, and franchisees.

Thus, Liberty has met its burden of showing an enforceable contract, breach of the contract and damage to Liberty.

       *b.*  *Virginia law permits equitable extensions of non-competition and non-solicitation covenants.*

Virginia, like many jurisdictions,[5] has held that courts may issue injunctions to extend non-competition covenants beyond their contractual terms. *See Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 553-56, 290 S.E.2d 882, 885-87 (1982). Virginia courts have rejected the proposition that prospective enforcement of non-competition covenants "rewrite[s] the parties' contract, creating a protected period upon which they had not agreed." *Roanoke Eng'g Sales*, 223 Va. at 555. Under Virginia law, courts will enforce a non-competition covenant starting on the date of the Court's judgment rather than the termination date of the contract containing the non-compete in certain circumstances. *See id.*, 553-56 (enjoining a party from violating the non-competition provisions of an employment contract for 30 months from the date of the order).

The court's equitable powers provide the authority to devise a remedy so as to "fit the changing circumstances of every case and complex relations of all the parties." *Id.* at 556. When it comes to such remedies, Virginia courts have maintained that "[e]quitable remedies . . . are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and

---

[5] Consistent with Virginia, other jurisdictions, including Idaho, have held that restrictive covenants may be equitably extended where a defendant violates the covenants. *See, e.g.*, *MWI Veterinary Supply Co. v. Wotton*, 896 F. Supp. 2d 905, 915 (D. Idaho 2012) (extending the term of a non-compete covenant when defendants ignored the covenant during its term); *WGI Heavy Minerals Inc. v. Gorrill*, 2006 WL 6105887 (Id. 1st Jud.Dist. April 21, 2006) (extending non-compete covenant that had expired where defendant was working for plaintiff's competitor); *see also Paws With a Cause. Inc. v. Crumpler*, 1996 U.S. App. LEXIS 41, at *22 (4th Cir. Jan. 3, 1996) (district court did not abuse discretion by fixing commencement date of restrictive covenant as date preliminary injunction entered even if results in extended covenant); *Jak Prod. Inc. v. Wiza*, 986 F.2d 1080, 1090 (7th Cir. 1993) (district court did not err in extending one year covenant because defendant violated the covenant); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511-512 (6th Cir. 1992) (court issued injunction for one year from date of order); *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1372 (8th Cir. 1991) (district court did not err in extending injunction beyond life of restrictive covenant); *Premier Indus. Corp. v. Texas Indus. Fastener Co.*, 450 F.2d 444, 448 (5th Cir. 1971) (court has equitable power to enjoin defendants beyond time period of restrictive covenant to effectuate some relief to plaintiff).

the natural rules which govern their use." *First Nat'l Bank v. Hughson*, 194 Va. 736, 753-54, 74

S.E.2d 797, 809 (1953) (Buchanan, J., concurring). Additionally, "[t]here is in fact no limit to their

variety and application; the court of equity has the power of devising its remedy and shaping it so

as to fit the changing circumstances of every case and the complex relations of all the parties." *Id*.

Indeed, a court sitting in equity can grant common law relief along with, or in lieu of, equitable

remedies so that complete justice can be done. *See Fidelity & Cas. Co. v. First National Exchange

Bank*, 213 Va. 531, 538 (1973). A court may use this power to enforce a non-competition and non-

solicitation covenant while qualifying the scope and duration of the injunction. *See Roanoke Eng'g

Sales Co., Inc.* 223 V.A. 552-56; *see also Hair Club for Men, LLC v. Ehson*, 2016 WL 6780310,

at \*4 (E.D. Va., 2016).

Applying Virginia law, Courts have ordered the non-competition and non-solicitation

covenants in Liberty franchise agreements to run following the entry of judgment, and beyond the

contractual time period, in order to prevent franchisees from benefiting from their violations of the

covenants. *See, e.g., JTH Tax LLC v. Johnson*, 2021 WL 2379541, at \*3 (E.D. La. June 10, 2021)

("To decline to extend the covenants in this case would permit [defendant] to benefit from her

violation of the covenants contained in the franchise agreement."); *JTH Tax, Inc. v. Harlan C.

Hanson Enterprises, Inc.*, 2013 WL 12097424 (E.D. Va. Mar. 25, 2013) ("[H]aving the permanent

injunction run from the date of judgment ensures that the [defendants] do not benefit from their

violation of the non-compete provisions of the franchise agreement."); *JTH Tax, Inc. v. Boone*,

2009 WL 10689518 (E.D. Va. May 7, 2009) (granting injunction against former Liberty franchisee

operating a competing business that ran from entry of judgment, and beyond the contractual time

period, rather than the date franchise agreements terminated); *JTH Tax, Inc. v. Fein*, No. 2:08CV21

(E.D. Va. Dec. 22, 2008) (granting two-year injunction against former Liberty franchisee beginning from the date of entry of judgment, and continuing beyond the contractual time period).

> c. *The Court should equitably extend the post-termination non-competition and non-solicitation covenants to prevent Defendants from benefiting from their breaches of contract.*

Consistent with Virginia law, the Court should grant Liberty's motion for preliminary injunction, and equitably extend the post-termination non-competition and non-solicitation covenants in the Franchise Agreement to two years from the date it issues a judgment. The term of the non-competition and non-solicitation covenants expired on December 4, 2020, two years following the execution of the Mutual Termination Agreement. *See* VC, Ex. A, §§ 10(b), 10(d); Ex. E. However, since the execution of the Mutual Termination Agreement, Defendants have failed to abide by the terms of the non-competition and non-solicitation covenants by filing hundreds of tax returns at the Competing Location from 2019 through 2021. VC, ¶¶ 42-52; Decl., ¶¶ 33-43. Liberty did not become aware of these violations of the non-competition and non-solicitation covenants until a recent audit of the IRS ERO Database. VC, ¶ 50; Decl., ¶ 41.

Defendants' breaches of the Franchise Agreement and the Mutual Termination Agreement have caused, and continue to cause, Liberty to suffer irreparable harm through loss of customers, goodwill and reputation. *See* Section IV.B *infra*. Equitably extending the non-compete and non-solicitation covenants is the only way to protect Liberty from Defendants' unlawful conduct, and to provide the parties with the benefit of their bargain with respect to the Franchise Agreement and the Mutual Termination Agreement. If Liberty had known of Defendants' breaches of the Franchise Agreement and the Mutual Termination Agreement during the term of the non-competition and non-solicitation covenants, it would have acted to enforce the covenants at that time. Without an equitable extension of the non-competition and non-solicitation covenants,

Defendants' willful, deceptive and unlawful conduct will be rewarded at Liberty's expense. Accordingly, the Court should equitably extend the non-competition and non-solicitation covenants to two years from the date of judgment in this case.

>    2.    Liberty is likely to succeed on its Defend Trade Secrets Act claim.

"To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020) (citing 18 U.S.C. § 1839(5)). Liberty satisfies all three requirements.

First, the DTSA defines "trade secret" broadly to consist of: "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *Id.* ("We start from the important premise that the definition of what may be considered a 'trade secret' is broad."). The Franchise Agreement identifies the Confidential Information Liberty treats as trade secrets, and which Defendants, as franchisees, must maintain in confidence, including customer information (e.g., customer names, addresses, e-mails, phone numbers, tax returns, files and records) and methods of operation (e.g., Operations Manuals). Ex. A, §§ 9(g)-(i); 12(a).

Liberty takes extensive measures to preserve and protect its trade secrets for the purpose of maintaining a competitive advantage, including, *inter alia*: (a) requiring franchisees to agree to never use the trade secrets for any purpose other than operating a Liberty franchise (Ex. A, § 12(a)); (b) requiring franchisees to return the confidential Operations Manual and deliver the Confidential Information to Liberty immediately upon termination or expiration of the Franchise Agreement (*Id.* § 9(g)-(i)); and (c) enforcing Liberty's interest in its trade secrets by initiating legal recourse against those who misappropriate its trade secrets (*Id.* § 10(h)). *See* VC, ¶¶ 84-86.

Each of Liberty's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. VC, ¶ 80. Liberty's trade secrets are not readily ascertainable by the public because they are disclosed only to franchisees in the operation of a franchise pursuant to a franchise agreement. VC, ¶ 81. Franchisees are licensed to use the trade secrets only pursuant to franchise agreements in the operation of Liberty franchises. VC, ¶ 82.

Accordingly, courts throughout the country have held that Liberty's Confidential Information, including Liberty's Operations Manual, customer lists and customer records, are trade secrets. *See, e.g., JTH Tax, Inc. v. Sawhney*, 2020 WL 6825585, at *4 (S.D.N.Y. Nov. 20, 2020) (holding Liberty's Confidential Information, including customer lists, are trade secrets); *JTH Tax, Inc. v. Freedom Tax, Inc.*, 2019 WL 2062519, at *11 (W.D. Ky. May 9, 2019) ("[T]he information at issue—among other things, the training that Liberty provides to its franchisees in franchise operations; information on marketing, advertising, sales, and business systems; confidential operating, marketing, and advertising materials that are unavailable to the public; and customer lists—qualifies as trade secrets."); *JTH Tax LLC v. Grabowski*, 2021 WL 3857794, at *6 (N.D. Ill. Aug. 30, 2021) (holding "information about [Liberty's] methods of operation, service, techniques, customer information, and marketing information" are trade secrets).

Second, Defendants misappropriated Liberty's trade secrets. "The [DTSA] provides the following three definitions of 'misappropriation': (1) the 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;" (2) the disclosure of a trade secret without the owner's consent; and (3) the use of a trade secret without the owner's consent.'" *Attia v. Google LLC*, 983 F.3d 420, 424 (9th Cir. 2020)

(quoting 18 U.S.C. § 1839(5)(A)-(B)). Liberty disclosed its trade secrets to Defendants pursuant to the terms of the Franchise Agreement, which required them to maintain the information as confidential. VC, Ex. A §§ 12(a)-(c). Defendants agreed to use the trade secrets for the sole purpose of operating a Liberty franchise. *Id*. Defendants also agreed that upon termination of the Franchise Agreement, they would never use, disclose, or permit the use or disclosure of Liberty's trade secrets in any manner whatsoever, and that they would return the trade secrets to Liberty. *Id*. §§ 9, 12(a). In breach of the Franchise Agreement, on information and belief, Defendants have used and are continuing to use Liberty's trade secrets in the operation of a competing tax preparation business. *See* VC, ¶¶ 42-52; Decl., ¶¶ 33-43.

Third, Defendants' misappropriation of Liberty's trade secrets has damaged Liberty. As discussed below, Defendants' breaches of the Franchise Agreement and the Mutual Termination Agreement have caused, and will continue to cause, Liberty to suffer irreparable harm to its goodwill, reputation, and relationships with customers in the territory covered by the non-competition and non-solicitation covenants.

### B.  Liberty will suffer irreparable injury unless an injunction issues.

The threat of loss of customers, goodwill and reputation occasioned by Defendants' operation of a competing business constitute irreparable harm and support injunctive relief. *See WGI Heavy Minerals, Inc. v. Gorrill*, 2006 WL 637030, at *4 (Id. Dist. Ct. Mar. 1, 2006) ("[E]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm") (quoting *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co.*, 240 F.3d 832, 841 (9th Cir. 2001)); *MWI Veterinary Supply Co. v. Wotton*, 896 F. Supp. 2d 905, 914 (D. Idaho 2012) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm. Business goodwill includes a company's reputation.")

(quoting *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991)).

Courts throughout the country have enjoined former franchisees from violating Liberty's non-compete provisions because the resulting loss of customers, goodwill and reputation causes irreparable harm to Liberty. *See, e.g., JTH Tax, LLC v. Williams-Eton*, 2020 WL 4708705, at *4 (E.D. Va. June 1, 2020) ("[Liberty's] loss of customers and damage to goodwill and customer loyalty, constitute irreparable injury."); *JTH Tax, Inc. v. Boone*, 2009 WL 10689518, at *6 (E.D. Va. May 7, 2009) ("Liberty has demonstrated that it will suffer irreparable injury as [former franchisee] is soliciting his former customers and operating a competing business, thus causing a loss of business as well as a loss of former and potential customers."); *JTH Tax, LLC v. Johnson*, 2021 WL 2379541, at *2 (E.D. La. June 10, 2021) ("Liberty being forced to compete for customers recruited by Liberty's proprietary information and business model . . . [a]ccordingly, the court finds that Liberty has established irreparable harm."); *JTH Tax LLC v. Gause*, 2021 WL 5085347, at *1 (W.D.N.C. Nov. 1, 2021) ("Plaintiff has suffered, and will continue to suffer, irreparable harm to its ability to protect its confidential information, customer goodwill, and reputation through Defendants' continued violations of the post-termination obligations of the Agreements."); *See JTH Tax, Inc. v. Olivo*, 2016 WL 595297, *4 (E.D. Va. Feb. 12, 2016) ("Defendant's continued breach of the covenants not to compete and not to solicit threaten Plaintiff's customer base and goodwill with their customers.").

Defendants' violations of the Franchise Agreement have caused, and will continue to cause, Liberty to suffer irreparable harm through loss of customers, goodwill and reputation in the territory covered by the non-competition and non-solicitation covenants in the Franchise Agreement and the Mutual Termination Agreement. *See* VC, ¶¶ 32-33, 63-65; Decl., ¶¶ 23-24.

Defendants' violation of the Franchise Agreement and the Mutual Termination Agreement also irreparably harms Liberty by allowing franchisees to avoid their contractual obligations and continue to reap the benefits of having been a part of a well-recognized national franchise after they ceased paying Liberty royalties. Allowing franchisees to blatantly ignore non-competition and non-solicitation covenants would wreak havoc on Liberty's franchise system, and all other franchise systems, because it would undermine the exclusivity of territories and eliminate the financial benefit for any franchisee to participate in a franchise, thereby destroying Liberty's (or any franchisor's) business model.

Moreover, irreparable harm is presumed where the relevant parties have agreed that a contractual breach results in irreparable harm. *See MWI Veterinary Supply Co. v. Wotton*, 896 F. Supp. 2d 905, 914 (D. Idaho 2012) (finding irreparable harm because the parties agreed that "any breach of the non-compete clause would cause irreparable harm"); *NAVEX Glob., Inc. v. Stockwell*, 2019 WL 6312558, at *9 (D. Idaho Nov. 25, 2019) (finding irreparable harm where defendant "acknowledged in the Agreement that his breach of the noncompete clause would result in immediate and irreparable harm"). Here, Defendants expressly agreed in the Franchise Agreement that breach of the non-competition covenant causes irreparable harm. VC, ¶ 33, Ex. A § 10(c) ("The parties further acknowledge that the full measure of damages to Liberty is greater, as such a breach [of the non-competition covenant] causes Liberty damage to the integrity of Liberty's franchised system, loss of franchisee and customer goodwill and irreparable harm.").

### C.    The Balance of Hardships Weighs in Liberty's Favor.

The balance of hardships weighs in Liberty's favor. Any alleged harm suffered by Defendants is solely self-inflected from their breaches of the Franchise Agreement and their misappropriation of Liberty's trade secrets, and does not outweigh the irreparable harm they would

cause to Liberty's franchise business and customer relationships. *See Battelle Energy All., LLC v. Southfork Sec., Inc.*, 2013 WL 5637747, at *4 (D. Idaho Oct. 15, 2013) (balance of hardships favored injunction because defendants cannot complain of hardship that will befall them when forced to desist from unlawful activities); *see also JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 825 (E.D. Va. 2007) (balance of hardships favored injunction against Liberty franchisee because entering injunction was "doing nothing more than enforcing [the franchisee's] contractual obligations"); *Donofrio*, 2006 WL 2796841, at *14 (E.D. Va. Sept. 26, 2006) ("Defendant will not be harmed if the permanent injunction is granted. An injunction will do nothing more than enforce Defendant's contractual obligations.").

Defendants freely agreed to the terms of the Franchise Agreement and reaped the benefits of their association with Liberty for several years. Defendants also agreed to the post-termination obligations and covenants set forth in Sections 9, 10(b), 10(d) and 12 of the Franchise Agreement, which protect the Liberty's legitimate business interests. *See* VC, ¶¶ 28-37; Decl., ¶¶ 19-28. By using Liberty's trade secrets to offer tax preparation services at the Competing Location in violation of the Franchise Agreement, Defendants took a calculated risk and proceeded at their own peril. The injunctive relief Liberty seeks does not burden Defendants because it merely enjoins them from engaging in conduct from which they are contractually barred, and from misappropriating Liberty's trade secrets.

Furthermore, Courts have recognized that Liberty's non-competition covenant is narrowly-tailored because it does not prevent former franchisees from operating tax preparation business or earning income. *See JTH Tax, Inc. v. Fein*, No. 2:08cv21, slip op. at 14-15 (E.D. Va. Dec. 22, 2008) *aff'd*, 2009 U.S. App. Lexis 25286 (4th Cir. Nov. 18, 2009) (entering injunction against Liberty franchisee because he still "may operate any other type of business or may operate a tax

preparation business outside of the [25 mile] limits"); *JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 825 (E.D. Va. 2007) (entering injunction against Liberty franchisee because he "is free to operate any other type of business, or to operate a tax preparation business outside of the specified territory."); *JTH Tax, Inc. v. Donofrio*, 2006 WL 2796841, at *14 (E.D. Va. Sept. 26, 2006) (entering injunction against Liberty franchisee and noting that "Defendant is free to solicit and provide tax preparation services anywhere outside the twenty five (25) mile boundary created by the Termination Agreement.").

Conversely, the denial of an injunction will adversely affect Liberty and its franchisees who abide by the terms of their franchise agreements. Licensed franchisees have placed their trust in Liberty to protect their substantial investment in Liberty's franchise system, and have a significant interest in preventing unlicensed individuals from operating competing businesses without adhering to the terms of a franchise agreement. *See* VC, ¶¶ 13-19, 33, 64; Decl., ¶¶ 4-10, 24.

**D.      An injunction is in the public interest.**

The public has an interest in the enforcement of contracts. *See Allen v. Campbell*, 2021 WL 737123, at *11 (D. Idaho Feb. 25, 2021); *see also JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 825 (E.D. Va. 2007) ("[T]he public interest lies in favor of upholding the contract between JTH and [its franchisee]."). Furthermore, "the public has a strong interest in ensuring that trade secrets are protected and that those who illegally misappropriate trade secrets are enjoined from doing so." *Citcon USA, LLC v. RiverPay Inc.*, 2019 WL 2603219, at *3 (N.D. Cal. June 25, 2019).

Liberty's request for injunctive relief merely enforces the Franchise Agreement and the Mutual Termination Agreement, which are valid, binding contracts between Liberty and Defendants, and prevents irreparable harm to Liberty's franchise business. Defendants contractually agreed to the post-termination covenants and obligations set forth in the Franchise Agreement and the Mutual Termination Agreement, including not to compete with Liberty and

not to use Liberty's trade secrets. *See* VC, ¶¶ 28-37; Decl., ¶¶ 19-28. The public interest is best served by enforcing these covenants, and enjoining Defendants from continuing to breach their contracts with Liberty and misappropriating Liberty's trade secrets.

      **E.**    **Defendants waived the Rule 65(c) Bond Requirement.**

While Federal Rule 65(c) typically requires the posting of a bond upon the issuance of a preliminary injunction, Courts will forego the bond requirement if the parties contractually agreed to waive the requirement. *See, e.g., PerkinElmer Health Scis., Inc. v. Mahnaz Salem*, 2021 WL 2548684, at *4 (C.D. Cal. Apr. 9, 2021) ("Although Federal Rule of Civil Procedure 65(c) typically requires the posting of a bond upon the issuance of a preliminary injunction, [plaintiff] need not post a bond in this case because [defendant] agreed to waive any bond when she signed the Agreement."); *Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 2011 WL 497978, at *12 (S.D.N.Y. Feb. 10, 2011).  Here, the Court should exercise its discretion to forego the bond requirement because Defendants expressly agreed in the Franchise Agreement to waive the requirement in any action for breach of the post-termination covenants. *See* VC, Ex. A § 10(h).

**V.**    **<u>CONCLUSION</u>**

For the foregoing reasons, Liberty respectfully request that the Court grant its Motion.

Dated: April 6, 2022          Respectfully Submitted,

                              **JTH TAX LLC d/b/a LIBERTY TAX SERVICE f/k/a JTH TAX, INC.,**

                              */s/ David W. Lloyd*
                              Meredith L. Thielbahr
                              David W. Lloyd
                              GORDON REES SCULLY MANSUKHANI, LLP
                              999 W. Main Street, #100
                              Boise, ID 83702
                              (208) 489-9095
                              mthielbahr@grsm.com;
                              dlloyd@grsm.com